1  -Jehan Zeb Mir, In Proper
2  417 Via Anita
   Redondo Beach , CA 90277
3  Telephone No.(310)375-1055

**11 CIV. 5211**

4

5

6

7

8            # UNITED STATES DISTRICT COURT

9          ## SOUTHERN DISTRICT OF NEW YORK

10              ### NEW YORK, NEW YORK

11

12

13
   | | |
   |---|---|
   | JEHAN ZEB MIR | **Case No.** |
   |            Plaintiff | |
   |     vs. | **COMPLAINT FOR PRELIMINARY INJUNCTION PERMANENT INJUNCTION AGAINST UNCONSTITUTIONAL** |
   | NIRAV R. SHAH, M.D, M.P.H.*as Commissioner* STATE OF NEW YORK DEPARTMENT OF HEALTH SERVICES STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT | **NEW YORK STATE STATUTE; AGAINST UNCONSTITUTIONAL REFERRAL PROCEEDING & AGAINST IMPROPER OFFENSIVE COLLATERAL ESTOPPEL** |
   |            Defendants | |

14

15

16

17

18

19

20

21

22

23

24  
   RECEIVED
   JUL 26 2011
   PRO SE OFFICE
25

26

27

28

---

COMPLAINT FOR INJUNCTION                                    Page 1

1

## PARTIES

(1).The Plaintiff is a resident of the County of Los Angeles, State of California.

(2) The Offices of Defendant Department of Health Services, State of New York
Department of Health are located in the Borough of Manhattan, N.Y. at 90 Church Street,
4th Floor, N.Y.,N.Y. 10007-2919  and at 2512 Corning Towers, Umpire State Plaza,
Albany, New York 12237 .

(2).The defendant Nirav R. Shah M.D. is the Commissioner of the State Department of
Health Services.

## JURISDICTIONAL ALLEGATIONS

(4). Plaintiff brings this action under and pursuant to 42U.S.C.ξ 1983 to secure equitable
relief from actions initiated by defendants under New York State law that violate of
rights, privileges, and immunities guaranteed to him by the United States Constitution ,
and directly under and through Article 1,Section 10, Clause 1 and the Fourteenth
Amendment to the United States Constitution.

 The Court has original jurisdiction to entertain this cause of action pursuant to the
provisions of 28 U.S.C. ξ 1343 and 28 U.S.C. ξ 1331.

The court's jurisdiction is also based on diversity under 28 U.S.C.Section1332 (a)(2).

## COMMON ALLEGATIONS

**BACKGROUND:**

(5) Plaintiff since 1972 had been continually registered and licensed by the California
Medical Board, Department of Consumer Affairs State of California as a Doctor of
Medicine and Surgery without any disciplinary actions before or after the current events
complained herein. Plaintiff has also been continuously licensed by State of New York
and by the Commonwealth of Pennsylvania since 1974.

(6).Plaintiff prior to that date, completed his internship at Elizabeth General Hospital, Elizabeth N.J.07201,a year of general surgical residency at St. Clare's Hospital, N.Y, N.Y 10019 and three years of General Surgery Residency Training at NYU /VA.-Hospitals N.Y.,N.Y.10010 and completed his one year Thoracic & Cardiovascular surgery residency training at Children Hospital of Los Angeles, CA 90017 (USC); Good Samaritan Hospital, Los Angeles CA 90027 and one year at University of Pennsylvania Medical Center PA 19104.

(7) Plaintiff honorably served more than 3 years in US Navy, as Commander and Surgeon, and had a 13 month tour of duty in Vietnam in 1969-1970.

(8). Plaintiff is certified by American Board of Surgery since 1970 and was twice re-certified by the American Board of Thoracic Surgery, in the years 1993 and 2003 for 10 years. Plaintiff never paid any settlements or judgments in any malpractice action in the past 50 years in the medical profession and no actions are pending. ([1]12 AR 0010; 170 AR 3594-3617; R.T. 10/21/2004, *Mir,* p.112, line 10-p.135, line 17; 67 AR 1664-1681)

(9).Plaintiff never had any disciplinary action against him since his state licensure in 1972 by any medical board or any hospital till the events described herein.

(10).In 2000, Plaintiff was a provisional member of the medical staff a Pomona Valley Hospital, Pomona California and was working under the direct supervision of the hospital and its active staff members/ surgeons for *any diagnosis* and *treatment* on all *elective or emergenc*y patients admitted by him including any pre-*operative, intra-operative and post-operative care.* Any diagnosis or plan of treatment including surgery must be approved by the hospital approved proctor before hand.

(11) On June 8, 2000, an eighty one (81) year old obese woman was transferred from the nursing home to the San Antonio Community Hospital Emergency Room with complaints of cold blue toes right foot at 7.00 a.m. Patient appeared to have suffered Stroke because she could not talk and had prior history of severe Essential Hypertension,

---

[1] AR is reference to the Administrative Record filed in the Sacramento County Superior court, volume followed by symbol AR and the page number. Respondent was served with the Administrative Record and will be lodged with this court.

Arteriosclerotic and Hypertensive Heart Disease; Tachyarrhythmia and Chronic Renal Failure with an elevated BUN of 28.The EKG showed Left Atrial Enlargement.

At 3.00 p.m. Plaintiff was contacted by the ER physician for the first time. Patient had undergone an ultrasound of and a brain scan.

The Ultrasound examination showed obstruction of Superficial Femoral Artery.

The brain scan showed several areas of old infarcts, probably due to emboli.

(12).Plaintiff ordered an Angiogram [arteriogram) to be done by the Staff Radiologist.

The Angiograms showed shadow of a clot sitting at the bifurcation of [Common][2]Femoral Artery ("CFA") and a long segment of complete calcified occlusion of mid- Superficial Femoral Artery "SFA" surrounded by numerous collaterals. Just couple of inches below the complete "SFA" obstruction, there was another complete obstruction of the Popliteal artery, which is a direct continuation of "SFA".  Significantly, there was no blood flow through the other 'Profunda'[deep] branch of Femoral Artery from its origin at bifurcation on, where the clot was noticed. There were others arteries such as the Right Internal iliac artery and top of blocked. Right mid-"SFA" and left "SFA" where shadows of clots were noticed, indicating recurrent emboli.

(13) Plaintiff took history and performed physical examination and found a bounding pulse in the area of bifurcation of Femoral Artery with complete absence of pulse just

---

[2]

   The main artery originating from the heart is aorta, which continues in the abdomen and divides into right and left Common Iliac Artery at the level of navel. This divides into Internal Iliac Artery which supplies organs within the pelvis and External Iliac Artery which continues into thigh and its name changes to Femoral Artery at the level of groin.(AKA, erroneously as Common Femoral Artery, which is an Archaic term.)

   About two inches below the groin, [Common] Femoral Artery gives off a branch called Profunda Femoris Artery ("Profunda") and continues as Superficial Femoral Artery ("SFA").

The Superficial Femoral Artery at the lower third and on the inner aspect of thigh courses to the back and its name changes to Popliteal Artery which then bifurcates at the lower margin of knee joint into Anterior and Posterior Tibial arteries supplying the front and back of the leg respectively. .(**18** AR00695-698)

below it, signifying an Acute Blood Clot or Embolus blocking the blood flow and the blood trying to push or break the clot down, manifested by a bounding pulse—a classic textbook diagnostic sign of 'Embolism on physical examination" This was confirmed by the findings on the Angiogram done by the Radiologist.

(14) Plaintiff admitted the patient to the San Antonio Community Hospital, wrote an Admission Note, particularly stating in the [3]Past History, surgery for varicose veins in 1950's, hysterectomy; history of smoking and she worked as a cashier in Rome ,NY and documented a diagnosis of 'Thrombo-Embolism".(thrombus meaning clot; embolism – moving from one area to another in blood downstream)

(15) Plaintiff tried to schedule the patient for emergency surgery at San Antonio Community Hospital and was informed that he could not do the case till 11.30 p.m. because other surgery was going on and they had no anesthesiologist. Plaintiff contacted neighboring Pomona Valley Hospital and was informed that they were not busy and Plaintiff could bring his patient. The primary care physician documented that fact in his history and physical done at Pomona Valley Hospital after transfer.

(16) Plaintiff explained to the family that patient needed emergency vascular surgery and time was the essence to restore circulation and it was imperative that he transferred the patient to Pomona Valley Hospital. The family agreed. Plaintiff called the nursing supervisor at San Antonio Community Hospital and informed the need for transfer. The nursing supervisor called the O.R. on telephone in the presence of Plaintiff and confirmed that surgery could not be done immediately, made arrangements for transfer. Patient had Medicare and Medi-Cal and the hospital is required by law to attest and certify that the transfer is necessary and such services cannot be performed at the transferring hospital in order to prevent patient dumping, duplication of services and such certification is required to get paid by Medicare.

---

[3] This Past History was *not* obtained by any of other three physicians who attended the patient.

(17) At Pomona Valley Hospital, Plaintiff obtained consent for <u>Embolectomy,</u> <u>Intraoperative Angiograms and a Femoro-popliteal bypass</u> graft as an [4]*ancillary* *procedure to aggressively improve blood flow in order to combat prolonged ischemia..*

(18) Plaintiff encountered great difficulty in finding an assistant/ proctor. Dr. Lau was on call in the Hospital ER for Vascular Surgery declined to proctor and finally on the third call agreed to assist and proctor on the condition that since he was on call in the ER, he could not tie himself down to a long case, that he could proctor only the 'Embolectomy' and not the' Femoro-popliteal bypass."

(19)The OR nurses would not bring a patient from the ward to the OR, unless the proctor was physically present in the OR. Once the proctor Dr Lau arrived Plaintiff performed Embolectomy and removed the offending clot an '*Organized  Thrombus*' at the bifurcation of femoral artery, with fresh secondary clots distally. This finding of two generation of clots ,old and fresh is specific and a classic diagnostic evidence of 'Embolism ' at surgery and is fully documented in the operative report.

(20)The <u>pathologist described the Organized Clot removed as  a'</u>*laminated clot'* <u>i.e.</u> <u>layers of clot successively laid over period of time in some secluded place, like enlarged</u> <u>heart chamber or within an arterial aneurismal sac.</u>

(21).<u>The operative findings confirmed the findings on physical examination and the</u> <u>Angiogram done by the Radiologist at San Antonio Community Hospital and EKG</u>

---

[4] At the Medical Board Hearing (infra) Plaintiff provided evidence from the medical literature that femoro-popliteal bypass can be done as an *Ancillary Procedure* during 'Embolectomy'. That the golden period to restore circulation is six hours after acute circulatory occlusion before irreversible ischemic injury takes place that Plaintiff was first contacted about 8 hours after the discovery of symptom at about 7.00 am by the nurses at the nursing home. That the angiograms were completed by about 5.30 pm. That patient was transferred to Pomona Valley Hospital at about 8.00 pm. and the surgery could not be started till about 10.00 pm. due to difficulty in finding a willing proctor.

That patient had a complete obstruction of mid superficial femora artery ("SFA") and femoro-popliteal bypass would have aggressively increased blood flow to aid in the reversal of prolonged ischemia and 'ischemic injury'. That femoro-popliteal bypass was not intended for the 'board's diagnosis of ' acute thrombosis of SFA"

finding of Enlarged Left Atrium where such clots are routinely formed and ejected periodically into circulation.

(22).The surgery was a complete success with full restoration of pulses, color, temperature and capillary filling, as documented by several nurses and two other physicians who followed the patient. There was no need to do an [5]angiogram or a Femoro-popliteal bypass, as the patient was brought back to same status as it existed before the event occurred.

(23).On Friday, June 9,2000, the very next day, Plaintiff complained to Chief of Surgery in a letter and documented the above facts, particularly emphasizing that delay in starting surgery due to lack of cooperation of proctors which almost injured his patient.

(24). Patient did fine for two days then on Saturday June 10, 2000, at 4 .00 pm. suddenly developed same symptoms. Plaintiff was contacted by the nurse on first call and he made a diagnosis of "Recurrent Thrombo-Embolism" and immediately ordered to place patient on NPO and to get the ready the patient for surgery and ordered and obtained a fresh consent for E*embolectomy, Intraoperative-Angiogram* and a *Femoro-popliteal bypass graft*.

(25).Plaintiff again encountered great difficulty in finding a willing proctor. Dr. Vinod Garg agreed to assist and proctor but informed Plaintiff that he could only *stay* for embolectony and not for the Femoro-popliteal bypass because his daughter was having some *party* and he had to be there.

(26) Plaintiff once again removed an '*Organized Thrombus*' with fresh clots distally, this time the occlusive clot was located at a much higher site at the bifurcation of Common Iliac Artery within the abdomen and once again succeeded in restoring pulses before the

---

[5] . Angiograms are fraught with great danger since it requires injection of nephrotoxic radio-opaque dye. Patient was dehydrated and just had had a large dose of nephrotoxic radio-opaque dye for pre-op. angiograms done by the radiologist with patient's elevated BUN of 28

At the Medical Board Hearing (infra) The Board's experts alleged that intra-operative angiogram should have been done to re-diagnose complete obstruction of "SFA" which had been clearly demonstrated on preop.angiograms by radiologist.

operative wound was closed and patient was removed from the operating table. However, the recovery was not so dramatic as after the first surgery, because there was another serious _delay_ of more than s_ix_ _hours_ but this time due to complete cessation of blood flow caused by a higher occlusion at Common Iliac Artery, which was well above all collateral blood flow in the leg (six hours is generally the time limit for correction of ischemia before irreversible injury takes place) because the daughter of the patient could not be contacted by repeated phone calls by nurses to obtain consent, (patient had been obtunded from before the first surgery and could not give informed consent).However, the nurses following surgery documented pulse by Doppler in the right foot till the morning of Monday, June 12, 2000. The leg was not expected to _warm up_ right away after repeated, prolonged ischemic insults _[even a kettle on a stove would take time before it starts whistling]_

(27).Following surgery, the recovery room nurse's notes show that Dr. Garg was on the bedside about 11.30 pm. on Saturday, June 10, 2000.

(28) On Sunday June 11, 2000 since the recovery was not as dramatic as the first surgery, Plaintiff tried to look for a assistant/proctor, including the Chief of Surgery and Chief of Staff to re-explore the artery and was unsuccessful to find anyone of them and could not perform surgery. Plaintiff could not document the unavailability of these individuals in the medical record for exposing everyone to liability creating enemies, besides such _peer review issues_ are protected from discovery under _California Evidence Code1157_ and every hospital requires a confidentiality of peer review agreement as a requirement of staff membership.

(29).The June 11, 2000(Sunday)nurse's notes show that Plaintiff was informed about the condition of the patient and Plaintiff told the nurse that _he was aware of the condition of the patient_. That patient would '_probably_' be going to surgery on Monday. June 2, 2000.as he was not sure, if he would be able to find anyone who would assist and proctor him even on Monday June 12, 2000 and he did not want to commit to the family.

(30)The nurse's notes Sunday June 11, 2000 also show that Dr. Garg was [6]repeatedly contacted by the nurses about the condition of the patient and he was not available, as was experienced by the Plaintiff the same day.

(31) On the Monday morning June 12, 2000 <u>the nurse pulse documented that pulse in the foot was faintly audible</u> by Doppler.

(32)Plaintiff contacted Dr. Garg once again to assist and proctor. Dr. Garg[7] told him that he would assist and proctor only <u>after he was done with his long line of cases</u>. Plaintiff had to wait at the hospital all day till midnight before he could perform surgery and go home. Finally Dr. Garg finished his cases and surgery was started at 10.00 p.m. causing another 12 hours delay and additional ischemic injury.

(33) Plaintiff first performed angiograms below the knee to assess 'run-off'[ open vessels], as the preoperative angiograms done by the radiologist on 6/8/00, did not show any' run-off' below the knee. A distal run –off was essential to assure blood outflow before a Femoro-popliteal bypass could be successfully undertaken.

(34) Upon documentation of satisfactory 'run-off' by intra-operative angiogram, an Embolectomy and a Femoro-popliteal bypass was performed and <u>Post bypass Intra-Operative Angiograms</u> documented blood flow across the distal graft-vessel anastomosis and blood flow heading all the way down to the ankles.

(35) Operating room Nurse Ramirez who had worked at the Pomona Hospital since 1963 testified at the Medical Board hearing that on June 12, 2000 before the patient was transferred to a gurney from the operating room table, pulses were heard by Doppler amplified by speaker system in the operating room in the presence of Dr. Garg.

---

However, the Medical Board's experts admitted that intra-operative angiogram' would not be needed for Plaintiff's diagnosis of 'Embolism'.

[6] At the Medical Board Hearing (infra) Dr, Garg denied that

[7] At the Medical Board hearing ( infra) Dr. Garg denied that..

(36) Patient postoperatively in the recovery room had <u>normal pulses, color and temperature</u> and nurse documented the pulses by Doppler and noted a <u>normal capillary filling</u>, which is the ultimate, most sensitive test of tissue viability at the cellular level.

(37) On June 14, 2000, patient's leg developed gangrene. Dr.Garg refused to proctor the amputation. Plaintiff complained to him, that, had the proctors been cooperative and not causing delay, his patient would be going home on that day instead of having her leg cut off. Plaintiff was able to obtain another proctor for the procedure.

(38) The patient did fine following above knee amputation and was discharged alive and well, however required a 'Gastrostomy' by a gastro-enterologist for her failure to feed herself due to her stroke related difficulty in deglutition and mental incapacity.

(39) On <u>June 18, 2000</u>, eight (8) days after his assisting and proctoring first surgery Dr. Garg allegedly prepared two proctoring reports, for two surgeries done on [8]June 10, 2000 and June 12, 2000 where proctors are required to complete the proctoring reports immediately at the conclusion of surgery. These reports were never shown to Plaintiff and were protected from discovery under *Evidence Code 1157*.

(40) In September 2000, these proctoring reports were considered by the Department of Surgery and Plaintiff was removed from proctoring in General and Thoracic Surgery, but was continued on proctoring in Vascular Surgery, apparently because he had attended only one vascular surgery patient.

(41) In September 2000 Plaintiff obtained a $ 600,000 IPA surgical sub contract.

---

[8] . At the Medical Board Hearing (infra), the MB introduced proctoring reports which were protected from discovery under Evidence Code 1157, during Dr. Garg's testimony. In his June 10, 2000, proctoring report he wrote that he informed Plaintiff to perform femoro-popliteal bypass and Plaintiff told him that he will do it in 2 days, where Plaintiff had obtained consent for a femoro-popliteal bypass before that surgery. This statement was false because he testified that before surgery ,he did not see Angiogram and without looking at angiogram, no surgeon can determine ,if patient needs a femoro-popliteal bypass graft. On cross-examination, he was asked what did he tell Plaintiff on June 10, 200, he could neither recall nor refresh his recollection even though he had his proctoring report right in front of him. He impeached his own proctoring report when he testified that leg was dead on June 10, 2000, yet he had recommended femoro-popliteal bypass in his proctoring report

---

(42) In October 2000, the Pomona Valley Hospital *reopened* the case (GF). Plaintiff complained to the Invasive Procedures Surgery Committee, in writing that there was delay and proctors did not want to *stay* for the Femoro-politeal bypass to be performed that the delay contributed to the adverse outcome

(43) On November 7, 2000, Plaintiff appeared before the Invasive Procedures Surgery Committee. Dr. Garg was present at the meeting and said nothing to for not *staying*. The committee did not find any wrong doing on Plaintiff's part and made no findings and closed the matter.

(44) On November 13, 2000, the Chief of Staff, a staff Radiologist at Pomona Valley Hospital summarily suspended Plaintiff's Vascular Surgery privileges without giving any reasons.

(45) Plaintiff requested Injunctive Relief in the superior court on the grounds that he would suffer irreparable harm because summary suspension was illegal under California Business & Profession Code Section 809 , requiring 'imminent danger ' to the life or health to an individual and Plaintiff could not be possibly be a danger 'imminent' or otherwise to any patient  because he was working under the direct supervision of the hospital and its proctors, and the patient  had been discharged alive and well six months earlier and he had no patients in the hospital facing any imminent danger. The superior court denied relief because Plaintiff had not exhausted administrative remedies first.

(46) In retaliation for filing Complaint for Injunctive Relief, the hospital terminated Plaintiff from the medical staff. Plaintiff requested reasons for suspension / termination' The hospital refused to provide 'acts and omissions'.

(47)Plaintiff filed an action for Declaratory Relief for courts to declare his rights under medical staff bylaws and California Business & Profession Code Section….., and point specific California Case law (***Rosenbilt v SuperiorCourt***)(1991) 231 Cal. App.3rd 1434 ) providing notice of charges including 'acts and omissions' to the physician facing discipline to enable defense, a due process requirement.

(48) That he could not wait to exhaust administrative remedies which the Hospital can delay and prolong for years and then get it reversed on writ petition and on appeal taking few more years and then have to go through another hearing lasting few more years, thus suffering irreparable harm.

(49) The superior court denied relief because Plaintiff had not exhausted administrative remedies. The court of appeal also denied relief on the same ground on the Injunctive and Declaratory Relief.

(50)  Within weeks of the Court of Appeal's Decision, the hospital terminated hearing which never got started and terminated Plaintiff from the medical staff as soon as Court of Appeal issued its opinion and reported to the medical board under Business & Profession Code Section 805.

**California Medical Board Proceedings:**

(51) On September 10, 2002, Medical Board of California interviewed Plaintiff.

(52) On August 21, 2003, the Medical Board filed the 'Accusation'.

(53) The [9]central charge in the Accusation was that Plaintiff made a wrong diagnosis of 'Thrombo-embolism' Right Femoral Artery, instead of Board's diagnosis of '[10]Acute Thrombosis of mid-Superficial Femoral Artery'

---

[9] The other charges were that (1) Plaintiff did not provide the treatment of 'Acute Thrombosis of  mid-"SFA by doing an Intraoperative Angiogram and a Femoro-polpiteal bypass" (2) that he did not use Saphenous vein for bypass graft

(3) he placed the lower end of the prosthetic graft between two arterial obstructions be in  the "SFA" and Popliteal Artery.(4) Improperly transferred patient from San Antonio Community Hospital to Pomona Valley Hospital (5)Documentation charges including failing to document history and physical.

The medical board's experts speculated that the mid-"SFA" was almost occluded due to long standing atherosclerotic process and it just so happened that on morning of admission

(54)The Medical Board in its Accusation relied on the consultation by Dr. Joshua Bardin and Dr. Deck These experts never saw, examined the patient, saw the *Angiograms* performed any surgery; examined the pathologic specimen, the '*Organized Clot*' or laminated clot as described by pathologist removed at surgery, provided any pre or post-operative care and, yet they made the correct diagnosis. Few weeks after writing his accusatory consultation, Dr. Joshua Bardin wrote to Medical Board that he had seen Angiograms and his opinion remained the same.

(55) Plaintiff personally called medical board's prosecuting attorney on several occasions to drop the Accusation, because it made no medical sense, and offered to meet board's experts in order to resolve the matter .The medical board showed no interest.

(56) The Medical Board hearings were held from October 18, 2004 to April 6, 2005, for a total of 'thirteen one day session.

(57) The Medical board's experts first contended that angiograms were crucial to diagnosis yet made the diagnosis of 'Acute Thrombosis of "SFA' without seeing  the Angiograms.

(58) After the Medical Board expert Dr. Bardin saw the angiograms apparently for the first time at the hearing, he testified that a clot may be present at bifurcation of femoral artery, but he was not sure, that he could not make any diagnosis on Angiograms either of 'Thrombo-Embolism 'or of 'Acute Thrombosis of "SFA" (**168** AR 3218, R.T., 10/18/04, *Bardin,* p. 80,line 22-25) (**170** AR 3502, R.T.10/21/04, *Bardin,*p.20 , line 15-20)  ;

(59).MB's Rebuttal witness Radiologist Dr. Bigoni, testified that clot could be present at

_____

to ER, on June 8, 2000, the mid –"SFA" became completely occluded, thus causing symptoms.

The bifurcation of[Common] Femoral Artery there was *no blood flow* through the "Profunda" branch of Femoral Artery, thus proving the cause effect relationship and supporting Plaintiff's diagnosis of Embolism.

(60) In order to rehabilitate the testimony of Dr. Bardin , that there was no blood flow through 'Profunda'and proving Plaintiff's diagnosis, the Medical Board produced Dr. Kenneth Deck. Before his testimony, a Medical Board official came to personally thank Dr. Deck for his testimony. The reason for this expression of special gratitude became apparent when Dr. Deck falsely testified that 'Profunda' was open by pointing to another vessel the Lateral Circumflex Artery 'as 'Profunda' contrary to testimony of five other experts.

(61) The pattern soon became apparent when on cross –examination it was discovered that Dr. Deck had falsified his C.V. which was introduced into evidence by medical board at the hearing that he was Certified by Vascular Surgery Boards

(62) Its not conceivable how even a medical student would confuse between two arteries, where 'Profunda' heads downwards and Lateral Circumflex Artery heads laterally at 90 degree angle to 'Profunda'

(63).Dr. Bardin also admitted that Plaintiff had placed the graft underline(correctly) below the obstruction in the Popliteal Artery instead of between the *two* obstruction in "SFA" and the Popliteal artery, as was charged in the Accusation.

(64)Thereupon Dr. Bardin on the spot made up a new charge that Plaintiff had placed the lower end of the graft above another obstruction in the Anterior Tibial Artery branch of the Popliteal Artery contrary to the pathologic examination of the amputated leg which had shown no such obstruction and, also had shown that the lower end of the graft was placed below the obstruction in the Popliteal Artery, disproving the allegations in the 'Accusation'.

(65) This obstruction in the Anterior Tibial Artery was ruled out by the Medical Board's own Rebuttal witness Radiologist Dr. Bigoni.

(66) Plaintiff's three experts testified on angiograms that there was a clot sitting at the bifurcation of right femoral artery, with no blood flow through 'Profunda', which caused

symptoms, with the other branch "SFA" being totally blocked, and, when the offending *'Organized Clot'* was removed at surgery, the blood flow was restored through the only open artery "Profunda" into the leg with resulting restoration of patient's pulses temperature, in the foot, thus proving a cause and effect relationship.

(67) The medical board experts could not explain why there was improvement of circulation, if indeed Plaintiff had made the wrong diagnosis. The medical board first had the burden to prove the correctness of its diagnosis, of 'Acute Thrombosis of mid "SFA" yet it produced nothing in support of its diagnosis, other than a mere speculation.0

(68) On *Cross- examination*, the Medical Board expert made the following admissions which were dispositive of the charge of 'misdiagnosis' in favor of Plaintiff

Medical board's experts admitted that

    (1) That they had no evidence for the Board's diagnosis of 'Acute Thrombosis of mid-Superficial Femoral Artery" because they had no prior x-rays showing that the mid-"SFA" was open. on the morning of June 8,2000, the day of ER admission, **170**AR 3509, R.T.10/21/05, p.27, line 19- AR 3510, p. 28, line 3

    2 That any such 'occlusion' whether acute or chronic could not have caused symptoms due to another second complete(100%) occlusion of Popliteal artery, just below the obstruction in the "SFA"

    (**168** AR 3184, R.T.10/18/05, p 46, line 14- AR 3185,R.T. p.47, line 7; AR3202, R.T.10/18/05, p.64, line 18-20)(**171** AR 3844, R.T.11/08/05, p.193, line 11-21)

    (3)That there are only two diagnosis which could have possibly caused patient symptoms. That the Plaintiff's diagnosis of 'Embolism' was far more prevalent (75-90%) than the Board's diagnosis of 'Acute Thrombosis of SFA'

    (**168** AR 3189, R.T.10/18/05, *Bardin* p.51, line 9- AR 3190.R.T.10/18/05,p. 52,line 22)(**168** AR 3290, R.T.152, *Bardin* p.152, line 16-21)

    (4)That the old clot, *'Organized thrombus'* which Plaintiff removed at surgery at the bifurcation of femoral artery,(56 **AR** 1477, 1534,1582) and higher up had the characteristics of an 'embolic clot' and such clot could not have been caused by

the 'Acute Thrombosis of SFA'. **169** AR 3429,R.T.10/20/04,*Deck*, p.108, line 20-
AR3431, p.110, line 6) (**170** AR 3491,R.T.10/21/04, *Bardin* , p. 9,line 15-
AR3492, p.10, line 9) (**170** AR 3499, R.T.10/21/4, *Bardin*,p.17, line 9-21)

(5)Plaintiff's diagnosis of embolism at the bifurcation of SFA was possible
based upon plain reading of the angiograms.(**181**AR 5398, R.T. 4/6/05, *Bigoni,*
p.93,line 15-18 ; AR 5416, p 111,p. 10-12 )

(6)That Plaintiff's treatment for his diagnosis of 'embolism' was correct, that
Patient would not need a femoro-popliteal bypass - the treatment for medical
board's diagnosis of 'Acute Thrombosis of SFA. (**168** AR 3201, R.T.10/18/05,
p. 63,line 7-25)(**168** AR 3224, R.T.10/18/05, 86,line 18-24)(**168** AR.3230,
R.T. 10/18/05, p. 92, line 18-21) (**168** AR 3232,
R.T.10/18/04, p. 94, line 6-9) or an intra-operative arteriogram (**168** AR 3312,3313
R.T.10/18/04, *Bardin*, p.174, line 22-p.175, line 8)(**170** AR 3519, R.T.10/21/05,
p. 37, line 4-22)

(7)That Plaintiff placed the graft correctly below the second complete obstruction
of Popliteal artery instead of between *two* complete obstructions in the Popliteal
artery and the mid-"SFA", as was charged in the 'Accusation'.

(8) That there were other areas like right internal iliac artery, mid –distal
portion of SFA in the arteriogram where embolic clots could be possible.
(evidencing recurrent emboli)(**181**, AR 5394,R.T. 4/6/5, *Bigoni*  p.89,line
19, 20; AR 5421, R.T. 4/6/5, *Bigoni,* p. 116, line 12-16 ; AR 5423, p.118,line22 –
AR 5424 p.119, line 3*)* (**168** AR 3278, R.T. 10/18/04; *Bardin*, p140, line 1,2)

(41)

**First Amended Accusation:**

(69).By the first day of hearing, it became abundantly clear that the medical board had no
case. Thereupon, the Medical Board started a campaign of delay, harassment and character
assassination and hearing lasted 12 one day session and in bad faith filed First Amended
Accusation (**52** AR 01418)( **124**AR 02187)

(70) The Medical Board had charged that Plaintiff did not do History and Physical and he did not use Saphenous Vein for bypass graft. The hand written Admission Note was the History which provided that patient had varicose vein surgery in 1950s, which removes Saphenous Vein. Plaintiff prepared that note at San Antonio Community Hospital ER and took it with him to Pomona Valley Hospital, so he would not have to spend time to write another note instead of attending the emergency. And Plaintiff left a copy of the Admission Note instead of original at the San Antonio Community Hospital.

(71) The Medical Board tried to kill two birds with one stones and on November 8, 2004 charged in the First Amended Complaint that Plaintiff had fabricated the 'Admission Note' and had fraudulently placed it into the medical records at Pomona Valley Hospital and San Antonio Community Hospital and also charged with making of five (5) false statements related to that note.

Everybody else had the 'Admission Note' except Medical Board. Its own Consultant Dr. Jerry D Wu, MD who interviewed Plaintiff referred to the preop. Admission Note in his Report, dated May 14, 2002 (**41**AR 01237)

(72)The Medical Records Personnel at Pomona Valley Hospital testified that the original 'Admission Note' was always present in the medical records of Pomona Valley Hospital(**56** AR 01450) and Plaintiff had no access to the medical records.

It is simply not conceivable that Pomona Valley Hospital made copies of more than 400 pages of the medical records for the Medical Board and the only page missing from the copied medical records was the one page two sided 'Admission Note'

(73) The ALJ dismissed all of the above charges added in the First Amended Accusation.

**Second Amended Accusation:**

(74).On April 6, 2005, at the conclusion of the hearing the Board filed a Second Amended Accusation "SAA" (**53** AR 01432) (**131**AR 2228, 2229) charging that Plaintiff had made seven (7) false statements during interview / hearing based upon the testimony

of Board's improperly called rebuttal [11]witnesses because their testimony had nothing to do with the rebuttal of any new matter in the Plaintiff's case. Any charges based upon alleged false statements made at the interview should have been brought in the Accusation, since Plaintiff statements were known to Board since the 'Interview,' years before the Second Amended Accusation was filed and Plaintiff said nothing different at the hearing than what he said at the interview.

(75)The alleged false statements in the Second Amended Accusation by Plaintiff were based upon the testimony of two witnesses Dr. Vinod Garg and patient's daughter were as follows:

1. Made false statements that proctor would not allow him to do a femoral-popliteal bypass procedure on June 8,2000.

2.Made false statements that proctor would not allow him to do a femoral-popliteal bypass procedure on June 10,2000.

3.Made false statement that there was no gangrene on June 12,2000.

4. Made false statements that there was no rigor mortis on June 12, 2000.

5. Made false statement that patient's leg was viable on June 12, 2000.

6. Made false statement regarding the reasons for transferring the patient from San Antonio Community Hospital to Pomona Valley Hospital Medical Center, and

7. Made false statements that he did not give the patient's family any other reason for transferring the patient other than the operating room at San Antonio Community Hospital being full when, in fact, the reason he gave the family was that the transfer was due to insurance payment reasons.

(76).The Medical Board presented (i) no evidence in support of False Statement Charge # 1 by producing Dr. Lau who was proctor on the case.

---

[11] . Board called Dr.Vinod Garg from Pomona Valley Hospital. He had served as a proctor. Dr. Garg had his license suspended for six months by NY State for fraudulent practice of medicine. Board also called patient's daughter.

(ii)*Plaintiff no where in the administrative record made the statement alleged in the False Statement Charge # 2.which was proctored by Dr. Garg.*

(iii) Patient had pulses and normal capillary filling after bypass surgery on June 12, 2000, therefore, Statements alleged in the False Statement Charge # 3, 4, 5 could not be false.

(iv). Patient was transferred by San Antonio Community Hospital because emergency surgery could not be done right away which was documented by the Primary Care Physician in his History & Physical dictated at Pomona Valley Hospital on that day.

The family knew that Patient had both Medicare and Medi-Cal which is universally accepted by all hospitals and physicians Plaintiff had nothing personally to gain by transferring. The son in law testified that Plaintiff told him that it was imperative he transferred, that time was the essence, that sooner he transferred, sooner he can begin the treatment.

**Denial of Hearing on Second Amended Accusation;**

(77).Plaintiff objected and moved to strike "SAA".(**132** AR 22312239) On May 25, 2005, motion was denied by the ALJ. Plaintiff requested hearing to introduce additional evidence and had identified expert witnesses including one from UCLA, (**146** AR 2343-2353) that statements made by Dr. Garg were not medically [12]possible or ethical.

---

(**179** AR 5196, R.T.4/5/05, *Garg*, p.58, line 11-15)

Dr. Garg proctored two procedures, on 6/10/00 and 6/12/00.He was required to complete and file each report immediately upon completion of surgery, yet he apparently waited till 6/18/00, to find out how the patient was going to do in order to fix them before preparing proctoring reports in order to cover himself as a supervisor.

**Dr. Garg's Proctoring Report for Surgery Done on 6/12/2000.**

[12]. Dr.Garg testified, as he had noted in his proctoring report dated 6/18/00, that on 6/12/00, the right foot was gangrenous, had rigor mortis, dead for a long time like a cadaver, not viable when Plaintiff did a bypass on June 12, 2000. (**86** AR1983),(**179** AR 5222, R.T.4/5/05,*Garg*, p.84, line 9- p. 85, line 15) whole foot was black. (**179** AR 5261, R.T. 4/5/05,*Garg,* p.123, line 14,15)

There was no evidence in the medical records of such a gross finding by any of the nurses or the physicians. Operating Room Nurse Ramirez testified that pulses were heard

by Doppler in the operated leg at the conclusion of surgery in the O.R, in the presence of Dr. Garg, as was documented in the dictated operative note. Nurse's notes in the recovery room showed pulses and a normal capillary filling in the operated leg. Apparently Dr. Garg had no compunction about lying under oath.

Inspite of all this compelling evidence, the Board based upon testimony of Dr. Garg charged in Second Amended Accusation (**131**AR 2229) that Plaintiff had made three false statements that on June 12, 2000 (i) there was no gangrene (ii) no rigor mortis (iii) leg was viable. (**53** AR01441)

These three charges were dismissed by court because patient had after surgery pulses and normal capillary refill in the leg indicating viability.

**Dr. Garg's Proctoring Report for 6/10/00 Surgery, Contradicted By his Testimony; Court Abused Discretion In Using it to Find Against Petitioner:**

Dr. Garg's in his proctoring report for surgery done on 6/10/2000, (allegedly prepared on the same date 6/18/2000, as the 6/12/00 surgery proctoring report) stated that he told Petitioner on June 10, 2000 that patient needed an 'immediate femoro-popliteal bypass', and Plaintiff told him that he will do it in 2 days where Plaintiff for each surgery had obtained consent for femoro-popliteal bypass graft for each surgery performed. Dr. Garg testified that he had not seen angiograms before surgery on 6/10/00. Without seeing X –rays, Dr. Garg like any other surgeon could not determine if patient needed 'angiogram'.

At the hearing Dr. Garg could not recall what he told Plaintiff on 6/10/00, or could support by his testimony what he had written in his 6/10/2000 proctoring report (**179** AR 5209, R.T. 4/5/2000, *Garg*, p.71, line 18-23) even though he had proctoring report (**85** AR) of 6/10/00, procedure right in front of him.

This was a patently false statement because Dr. Garg testified that patient's <u>leg was not viable on June 10, 2000,</u> yet he had noted in the proctoring report that he had recommended 'immediate femoro-popliteal bypass ' (179 AR 5223, R.T. 4/5/2000,*Garg*, p.85, line 16-19.) On the contrary, Dr. Garg knew and testified <u>that bypass was not indicated on 6/12/2000 because leg was not viable.</u> (179AR 5223 R.T.4/5/2000, *Grag*, p. 85, line 2-15)

Furthermore, Dr Garg testified that he never examined the patient before surgery, reviewed medical records and the saw the arteriogram.(**179** AR 5204, R.T. 4/5/2000,*Garg*, p.66, line 19-24; AR 5218, R.T. 4/5/2000, *Garg,* p.80, line 24,25)

Plaintiff's experts would have testified that Dr. Garg could not have made the determination that patient needed "immediate femoro-popliteal bypass" unless he had seen the arteriograms and he could not have recommended a bypass on a leg which he testified was not viable on 6/10/00.

The superior court prejudicially abused discretion in rejecting 6/12/00 proctoring report and believing 6/10/00 surgery proctoring report, both prepared on the same day 6/18/00,in finding that Plaintiff made a false statement. However, both the Board and the court denied trial or opportunity to defend on this charge and due process.

**Dr. Garg's other incredible statements** .The court abused discretion in not weighing several other incredible statements by Dr.Garg before finding that Plaintiff made a false statement. Dr. Garg testified he as a proctor was not a supervisor, contrary to Medical staff bylaws and Surgery (**71**AR 1774) Department Rules & Regulations, (**28** AR 1096, 1102, 1103, 1104) (R.T.4/5/2000 p.84, line 24-p. 65, line 17) yet he testified that he was there to see that surgery is done safely and appropriate technique was used.(R.T. 4/5/00, p.64, line 3-6).

Despite his admitted duty to make sure surgery was done safely and proper technique was used, he did not intervene to take over the case to perform the right procedures, a bypass on 6/10/2000 and an amputation on 6/12/2000, as he had noted in his proctoring report. Even the Board found in its 'Decision', that it was not clear why Dr.Garg did not intervene on June 10, June 12, 2000 ? (**167**AR 3129, last paragraph)

The explanation is simple, there was nothing to intervene. Since, he did not stay for the femoro-popliteal bypass on 6/10/00, and patient ended with amputation on 6/14/00, he fabricated the proctoring reports to protect himself. On June 14,2000 Petitioner told Dr. Garg that his failure to stay for bypass on June 10,200 led to patient's adverse outcome (**26** AR 5428-30, R.T. 4-06-05, *Mir*, p.123, line 23 thru p.125, line 25) as he did in N.Y. when he hid the lapratomy pad left during first surgery, got caught and was suspended by NY state.( **180** AR 5428-543,R.T. 4/6/05, *Mir*, p.123,line 22- p.126,line 2)(**84** AR 01963-1979)

Dr.Garg denied he saw the patient after surgery or was present at patient's bedside on 6/10/2000, as documented in the nurses notes (**179** AR, 5238, 5239 p.100, line 18-p.101, line 23) Dr. Garg denied that nurses contacted him on 6/11/2000, as documented and could not read his name in the nurses notes,
(**179** AR5244, 5245, R.T.4/5/05, *Garg*, p.106, line 18- p.107 line 21). He denied that on 6/12/00.he told Petitioner that he will proctor only after he had completed all of his other procedure despites pleas from Petitioner that this was an emergency and needed to be done urgently.( **177** AR 4913-14, R.T. 3-10-05, p.113,line 4 –page 114, p. 8 ).The surgery was finally started at 2115 hour.

**Decision by California Medical Board**.

(78) The California Medical Board abused discretion, <u>denied due process and a trial</u> and denied request to introduce additional evidence, in violation of California APA, California and U.S. Constitution and <u>found against Plaintiff on the remaining six charges of making a false statement on the Second Amended Accusation.</u>

(79)The ALJ/ Board in its decision completely ignored the unopposed, binding Admissions by Medical Board's experts dispositive of the Charge of misdiagnosis in favor of Plaintiff instead based its decision on irrelevant, impeached testimony by Medical Board's experts on direct examination completely disregarding the evidence produced the Admissions on the cross- examination. By not considering, appraising and ruling on 'binding, unopposed Admissions, on the charge of 'misdiagnosis, the Medical Board <u>denied due process and a trial</u>.

(80) The Medical Board could not prove the 'documentation charges 'as alleged in the Accusation and its two Amendments. The ALJ denied due process when she assumed the role of the prosecutor and inserted into 'Decision' new absurd findings/ charges on documentation, without an Accusation, notice trial or proof, thus denying due process.

(81) On December 6, 2006, Medical Board revoked Plaintiff's medical license with effective date of January 6, 2007.   (**Exhibit 1**)

**Sacramento County Superior Court Proceedings:**

(82)In Opposition to the brief on writ of administrative mandamus at superior court, ( Sacramento County Superior Court Case # **07 CS00036**) the Medical Board completely ignored the lead argument and the evidence of 'binding admissions' by its experts, dispositive of the charge of 'misdiagnosis' in favor of Plaintiff, since it had none.

(83) The superior court in its ruling, like ALJ also <u>did not consider, appraise ,weigh into weight of the evidence and rule on</u> the <u>unopposed, argument and the evidence of 'binding 'admissions' by Medical Board experts, dispositive of charge of 'misdiagnosis', in favor of Plaintiff</u>. Instead, superior court cited testimony of Dr. Bardin on direct examination

(**56** AR 01575),

without any reference to his admissions *on cross-examination* and made no mention of

testimony of Plaintiff's experts and made a finding on weight of the evidence [without

weighing 'admissions'] that Plaintiff made one wrong diagnosis- a clear [13]denial of due

process. However, the superior court made no findings of ***'gross' and 'repeated***

***negligence'*** or ***'gross' and 'repeated incompetence'*** and found that Plaintiff's

contentions were not entirely lacking in evidentiary support.

(84) The superior court dismissed five (5) out of six (6) facially false charges of making

false statements. The superior <u>without</u> holding a limited trial as permitted by California

Code of Civil Procedure 1094.5 or <u>remanding</u> for a trial on the remaining charge of

making false statement-a trial Plaintiff never had had, found that Plaintiff made one

untruthful statement that

> "Proctor [Dr. Garg] would not *allow* him to do a
>
> femoro-popliteal bypass on June 10,2000"

***A statement Plaintiff made no where in the administrative record***. The superior court

based this finding against Plaintiff on a statement in Dr. Garg's proctoring report for June

10, 2000  prepared on 6/18/00 surgery <u>that he told Plaintiff to do a  femoro-bypass</u> and

Plaintiff told him that he will do it in 2 days.

Dr. Garg was asked on cross examination, what he told Plaintiff on June 10, 2000, and

Garg could not recall even though he had his proctoring report in front of him to refresh

his recollection. Instead, <u>he testified that the leg was dead on 6/10/00</u>, thus impeaching

his own proctoring report.

---

[13]  . "The officer who makes the determinations must consider and appraise
the evidence which justifies them . . ...The "hearing" is the hearing of
evidence and argument.  If the one who determines the facts which underlie
the order has not considered evidence or arguments, it is manifest that
The hearing has not been given. One decides must hear."

***Morgan v United States*** (1936) 298 US 468-480.481.*(*56 S. Ct. 906, 80 L. Ed. 1288)
Cited by California Supreme Court in <u>Cooper v Board of Medical Examiners</u> 1950) 35 Cal. 2d 242; 217 P.2d 630;
1950 Cal. LEXIS 331; 18 A.L.R.2d 593

1   If this testimony of Dr. Garg <u>that leg was dead on 6/10/00 is correct</u>, then Garg could

2   not have allowed to do a bypass on June10, 2000 and the alleged 'false statement' could

3   not have been false. However, the superior court made no finding of '***moral turpitude***'.

4   Without a finding of *'moral turpitude'* the California Medical Board could not lawfully

5   impose any penalty based on *bare finding* of allegedly making a false statement at the

6   hearing without  proof of intent, materiality or benefit to Plaintiff. It was not material

7   because Plaintiff restored pulses in the foot after each surgery and brought patient back to

8   same status patient had before the incident and did not need femoro-popliteal bypass.

9   Furthermore, medical board's expert admitted that patient would not need femoro-

10  popliteal bypass for Plaintiff's diagnosis of 'thrombo-embolism' and Plaintiff never

11  admitted that he made the wrong diagnosis that he needed the excuse that he could not

12  perform femoro-popliteal bypass because proctor Garg would not allow it.

13  (85).The superior court did not dismiss or the very least remand for hearing on new

14  charges/ findings bootstrapped into the Decision by ALJ on documentation, without an

15  accusation, notice, trial or proof, even though the superior court dismissed some of them.

16  However, that was another denial of due process.

17  (86). On August 10,2007, the superior court <u>set aside and vacated Medical Board's 2006</u>

18  <u>Decision</u> pursuant to Code of Civil Procedure Section 1094.5 (f) and remanded to *<u>re-</u>*

19  *<u>determine penalty consistent with the findings of the court on submitted matters on the</u>*

20  *<u>writ of administrative mandamus</u>.*      (**Exhibit 2**)

21  **Writ Petition to California Court of Appeal:**

22  (87)Plaintiff filed writ of mandate pursuant to California Business & Profession Code

23  Section 2237 and requested immediate stay of court's remand order based on several due

24  process violations and lack of substantial evidence supporting the findings of the

25  California Medical Board and the Superior Court. (**C058393**)

26   On April 4, 2009, the court of appeal (3rd.Dist.) promptly summarily denied the writ of

27  mandate without providing oral arguments or issuing a written opinion.

28  **California Medical Board's New Decision by on Remand:**

(88) On June 13,2008 ,the Medical Board in contempt disobeyed court's judgment and order on the writ of administrative mandamus to re-determine penalty consistent with August 10, 2007 findings of the court on writ petition. As a delaying and harassing tactic took almost one year on remand and made a *word by word, paragraph by paragraph, page by page*, the same vacated 2006 Decision, without providing oral or written arguments on redetermination of penalty and without considering evidence of mitigation. The Medical Board made the same unsubstantiated findings of '*gross*' and '*repeated negligence*' based on allegedly making of one wrong diagnosis, in violation of California Business & Profession Code Section 2234 (c) and (1) where Plaintiff had provided correct treatment for hs diagnosis and treatment of board's diagnosis by femoro-popliteal bypass and intraoperative angiogram was not indicated as testified by board's expert. The findings of '*gross' and 'repeated negligence'* had not been upheld by the superior court and again revoked Plaintiff's medical license. (**Exhibit 3**)

**Post-Remand Proceedings:**

(89)Plaintiff made a Motion to Set Aside and Vacate Penalty because Medical Board disobeyed writ for not re-determining penalty consistent with findings of the superior court, instead made a new decision which was nothing but *word by word, paragraph by paragraph ,page by page* the same old vacated 2006 decision and did not provide a hearing on penalty redetermination.

That California medical board could not make a finding of 'gross' and 'repeated negligence' or incompetence [when superior court did not uphold such findings] based on allegedly making one wrong diagnosis and determine any penalty. That "CMB" could not impose any penalty on allegedly making one false statement at the hearing without trial and without any evidence of having made such a statement and without finding of 'moral turpitude' by the superior court.

Plaintiff reviewed 748 consecutive Decisions by the Medical Board in the 2 ½ year period from January 12,2006 to July 2008 when Plaintiff was revoked twice and produced evidence that Medical Board discriminates members of the minority group as judged by their

surnames without even including Afro-Americans who have  Anglo-European names. That the members of minority group are most likely to get 'revoked' and least likely to get lightest penalty of 'reprimand and these members of minority group are least likely to settle with the Medical Board, showing a perception amongst members of minority groups that they are unfairly targeted.

That Plaintiff was the only Physician who was revoked twice for allegedly making a 'wrong diagnosis', where in the same months when Plaintiff was revoked, Medical Board had reprimanded [14] physicians who had  admitted committing far more serious offenses, had made several wrong diagnosis, performed unnecessary surgeries and had  caused injury to patients by there technical incompetence or misdiagnosis.

---

[14] . **The following physicians were *reprimanded* in February of 2007,when Petitioner was revoked. (Exhibits; Actual Decisions are on Sacramento superior court file)**

(i)    **Ebenezer Olatunde Ajilore, MD**

Dr. Ajilore admitted as charged with gross negligence for performing unnecessary total abdominal hysterectomy for questionable, chronic uterine bleeding which was not an indication for surgery where such bleeding could have been controlled by oral contraceptives; Operative report did not adequately and accurately describe the operative findings. Following discharge, patient was found to have obstruction of left ureter. There was extreme departure from standard of care which required moving the bladder away from uterus during surgery and general unprofessional conduct.

(ii) **Jeffery P. Block, MD**
Dr. Block admitted as charged with gross and repeated negligence, incompetence, failure to maintain adequate medical records. He performed colposcopy on a pregnant woman to biopsy a high grade pre-cancerous lesion. The procedure caused lacerations within vagina and left ovary. The surgery was avoidable .The pathology report showed a portion of fallopian tube in the specimen. The operative notes were inadequate to describe the event that took place.

(iii) **Marshall William Grant, MD**
Dr. Grant admitted as was charged with repeated and gross negligence in care of 12 patients.   Medical Board's penalty was issuance of letter of reprimand.

(iv) **Freddie L. Hayes, MD**

Dr Haynes was charged with 29 different causes for discipline for negligence, repeated negligence, inadequate medical records, in 14 different patients.

(v) **Syed Faisal Jafri, MD**

Dr. Faisal was found to have unethically used a letterhead of University of Kansas ,violatingCalifornia B&P Code sections 141(a), 2305, and 2234

(vi) **Veronica Lazarus, MD**

Dr. Lazarus was cited when he failed to report change of address and practiced under false and fictitious name without a fictitious name permit. Dr. Lazarus was charged with gross negligence, repeated negligence, incompetence, false statement on the pathology request form, which she admitted, violation of professional confidence, inadequate records.

(vii) **Medhat Mansour, MD**

Dr. Mansour was found to have failed to maintain adequate medical records in two patients and repeated acts of negligence, repeated negligence.

(viii) **Eric Neil Sorenson, MD**

Dr. Sorenson made the wrong diagnosis of herpes of labia when the patient had cancer inspite of several repeat visits with complaints of bleeding from the vaginal area. He continued to treat with medications without further examination. The cancer subsequently metastasized and patient died. He also failed to maintain adequate records.(**Exhibit E, Judicial Notice**)

**Following physicians were reprimanded in July 2008, when petitioner was revoked for the second time.**

(i) **Charles Amis Finn, MD (License # G-71848)** Dr Finn failed to perform an adequate physical examination, failed to maintain medical records, and missed the diagnosis of acute, complex fracture of the proximal tibia in violation of Business & Profession Code section 141(a), 2305  and 2234.

(ii) **Hashemiyoon, Robert Babak, MD (License # G-86202)**  Dr Hashemiyoon admitted to prescribing dangerous drugs to patients ,he treated  over the internet ,without ever examining the patients in person ,in violation of California Business & Profession Code section 2227,subdivision (a) (4).

(iii)  **Huberman, Richard Allen, MD ( License # G-28477)** Dr. Huberman performed extensive surgery, planter fascia release and surgical excision of heel spur  on the wrong foot in violation of California Business & Profession Code sections 141(a), 2305 and 2234

**(iv) Kotzen , Rene Marlon , MD (License # A-53047)** Dr. Kotzen had a delayed recognition of post-operative complication and failed t o recognize its severity with patient developing cauda equina syndrome., a paralysis, requiring an immediate decompression, in violation of  California Business & Profession Code sections 141(a), 2305 and 2234

**(v) Manzini, Joseph Anthony, MD (License # G-62860)**
Dr. Manzini had pled guilty to crime, violating 21 U.S.C. Sections 331(a) and 333( a)91) for the delivery for introduction into interstate commerce of a misbranded drug, unprofessional  conduct under California Business & Profession Code sections, 2226 and 2237. For two years, he purchased and administered to approximately ten patients unapproved by FDA, Botulinum Toxin Type A without informing patients ,in violation of California Business & Profession Code sections 2238   Dr. Manzini was sentenced to two years probation.

**(vi) McKeen , Robert V. Jr., MD (License # C-51274)** Dr.McKeen performed major, lap band surgery on two patients who developed complications. But Dr. McKeen was not available. In one case, he was out of the state, in violation of California Business & Profession Code sections 141(a), 2305 and 2234.

**(vii) Odea, John Patrick Kle, MD (License # A-A-32629)** Dr. Odea admitted to factual allegations in the Accusation of Repeated negligence on several patients; incompetence; failure to maintain records; unprofessional conduct.

**(viii) Osei-Tutu, Earnest Paul, MD (License # G-85302)** Dr. Osei-Tutu treated 13 patients with a revoked license in violation of California Business & Profession Code sections 141(a), 2305 and 2234

**(ix) Patel, Jaotinkumar K, M.D. (License # A-43752)** Dr. Patel admitted each and every charge and allegation in the First Amended Accusation No. 04-2005-168707. that he repeatedly missed the diagnosis of cancer of the breast over 10 month  period of care when patient repeatedly presented with a breast lump . Patient finally had surgery, chemotherapy and radiation but passed away.

**(x) Sirois , Cindy Nguyen, MD (License # A-71013)** Dr. Sirois failed to disclose in her license application in Alaska ,that she was subject to investigation by the Florida Medical Board in 2005 ,which resulted in citation and fine, in violation of  California Business & Profession Code sections 141(a), 2305.

Plaintiff requested remand or a hearing on the issue of discrimination by the California medical board based on California case law. (***Talmo v Civil Service Comm.*** (Cal. App.2 Dist, 1991) 231 Cal App. 3d 224 282 Cal. Rptr. 240)

(90)The superior court denied remand if Plaintiff received disparate treatment because of his national origin and religion and denied the Motion to Set Aside and Vacate penalty.  On January 10, 2009, superior court discharged writ of administrative mandamus without providing any relief.

## Writ of Mandate to California Court of Appeal:

(91) Plaintiff in writ to Court of Appeal stated that California Medical Board disobeyed writ of superior court when it did not determine penalty consistent with findings of superior court on writ petition and recycled its 2006 decision as 2008 decision.

**(Exhibit 4)**

(92) On February 22, 2010, the court of appeal (3rd Dist.) in an Unpublished Opinion **(Case#C061570)** agreed with Plaintiff and issued peremptory writ ordering superior court to set aside and vacate medical board's Corrected Decision of June 13, 2008 to revoke and to remand <u>for board to re-determine penalty consistent with the August 10, 2007 Ruling of the superior court,</u> <u>as was originally ordered by the superior court on August 10, 2007</u>. The court found that the <u>dismissed findings by the superior court changed the factual and legal basis of the decision</u> of revocation. **(Exhibit 5)**

(93)The court of appeal declined to rule on the merits of Ruling of the Superior Court August 10, 2007, based issue of *res-judicata* which – an issue not raised or briefed by the parties, as required under California Government Code Section 68081.

(94).The court of appeal based res-judicata on (*Hagan v Suprior Court* ( 1962) 57 Cal. 2d 767 770-771), as reason for not deciding these issues where California Supreme Court had particularly rejected '*Hagan'* opinion in a landmark case.(***Kowis v Howard*** (1992) 3 Cal. 4th 888,897, 12 Cal.Rptr.2d 728,838 P 2d 250…….. summary denial of a writ petition is not "on the merits " for law of the case purposes)  and the court of appeal on

this particular issue had provided that summary denial of writ petition without oral arguments and written opinion under section 2337 is not res-judicata (***Landau v Superior Court*** (1998, Ist. Dist) 81 Cal. App. 4th 191; 97 Cal. Rptr. 2d 657; 1998 Cal. App. LEXIS 1110…… it is clear that not all summary denials of such writ petitions will be on the merits. If summary denial of a writ petition prevents application of law of the case principles, so be it citing, *Kowis v Howard* 3 Cal. 4th 888, 897, 12 Cal.Rptr.2d 728)

The Court of Appeal denied Petition for re-hearing.

**Denial of Petition for Review By California Supreme Court:**

(95)The Supreme Court denied Petition for Review. **(S181557)**

(96) The Sacramento County Superior Court pursuant to the order of Court of Appeal set aside and vacated its decision discharging writ and the Medical Board's 2008 Decision to revoke and ordered to re-determine penalty and provide oral or written arguments.

**California Medical Board's Decision on Remand:**

(97) On July 29, 2011, oral arguments were held before California Medical Board at Sacramento, California.

(98) On September 27, 2010, the California Medical Board in contempt of the court's order for the second time made a new 2010 Decision which was nothing but *word by word, paragraph by paragraph, page by page* rendition of twice vacated 2006, 2008 Decisions and re-determined penalty consistent with its illegal 2010 decision, instead of the findings of the superior court 2007 Decision, as ordered and placed Plaintiff on probation. In order to achieve that end, California medical board once again made findings of *'gross'* and *'repeated negligence'* based on allegedly making one wrong diagnosis for which according to medical board's own admissions in its 2006,2008,2010 decisions that there is no penalty for single act of negligence. (**Exhibit 6**)

**Allegations Against State of New York, Department of Health Services**

(99) On May 1, 2006, Plaintiff applied for activation of medical license which he had held since 1974 and informed about the March 3,2006 Proposed Decision of the ALJ in the California Medical Board's action. He informed that he was <u>denied due process when no hearing was held on Second Amended Accusation</u> ,that he intended to seek judicial review.

(100).On December 6, 2006, the California issued it Decision after stay and reconsideration, revoking license for two years with effective date of January 7, 2007.

(101) On December 12, 2006, Plaintiff personally spoke to Mr. Harold Ellsworth, senior investigator N.Y. State Office of Professional Medical Conduct and informed about the 'Decision' of the California Medical Board.

(103) On December16, 2006, Plaintiff wrote to Mr. Ellsworth about lack of evidence supporting California Medical Board's finding of making one wrong diagnosis and intentions to file writ of administrative mandamus in the California superior court.

(104) On December 22, 2006, Mr. Robert Bogan, Associate Counsel Office of Professional Medical Conduct bypassing the investigation, interview and voting by members of the Investigating Committee, as provided under N.Y. Public Health Law Section 230, (10)( a), filed Notice of Referral Proceeding set for January 16, 2007 and a Notice of Charges based on the Decision of the California Medical Board on 'gross' and 'repeated' negligence; 'repeated' and 'gross' incompetence for allegedly making one 'wrong diagnosis'; moral unfitness for allegedly having made six false statements [without trial] and failure to keep medical records.[ charges/ findings added into 'Decision ' by "CMD" after failing to prove documentation charges alleged in the Accusation] (**Exhibit 7**)

(105) On December 28, 2006, Plaintiff informed Mr. Bogen that hearing should be continued since legal proceedings were pending in California superior court as  he was informed by his paralegal secretary in his office, that he could get continuance if the matter was pending in the court. (**Exhibit 8**)

(106).On January 9, 2007, Mr. Bogan informed Plaintiff that the hearing set for January 16, 2007 had been adjourned to February 22, 2007. He demanded Plaintiff to sign a 'Consent Agreement' or a 'Surrender Order'. He informed Plaintiff that the evidence Plaintiff may

present was limited to extenuation and mitigation. <u>That Plaintiff may not, in State of New York attack the underlying California decision</u> that is the basis of for the action against him in New York.[ *please note he phrases in State of New York and avoids relying on New York State law*] **(Exhibit 9)**

(107) On February 8, 2007, Mr. Bogan in order to confirm telephone conference with ALJ Kimberly O'Brien regarding continuance of hearing set for February 22, 2007 based on fact that writ petition was pending in the California courts on the verbal affirmance that Plaintiff <u>would not practice in New York</u> until the new date for hearing on March 22,2007 and demanded a <u>written agreement not to practice medicine in the State of New York</u> until the matter was finally resolved in the State of New York. That Plaintiff did not agree to enter a written agreement not to practice in the State of New York. That ALJ. Kimberly O'Brien denied request to adjourn beyond March 22, 2007 <u>unless a written agreement not to practice medicine in the State of New York</u> was signed until appeal was resolved in the State of California. Unless Plaintiff signed the 'agreement' the matter will proceed to hearing. **(Exhibit 10)**

(108) On March 22, 2007 Plaintiff informed Mr. Bogan that ALJ O'Brien's order was quite clear that Plaintiff would not practice in the State of New York until the matter was decided in California Courts. Plaintiff objected to paragraph 14 of the 'agreement' prepared by Mr. Bogan <u>providing that the agreement was signed with free will and accord and not under duress, compulsion, restraint of any kind or manner in making the application.</u> Plaintiff objected to the terms of the agreement that he would not practice in any other State Because State of New York had no jurisdiction in other States, what other States do with the Decision of California Medical Board is their business and deleted any State. He objected to notification to National Data Bank and placement on New York State website.**(Exhibit 11)**

(109) On May 14, 2007, Plaintiff provided Mr. Bogan the copy of Notice & Memorandum of Points & Authorities supporting writ petition filed in the California Courts and emphasized that 'CMB' diagnosis was incorrect and on the falsity of charges and denial of trial on the Second Amended Accusation.

(110) On August 10, 2007 the California superior court set aside and vacated California Medical Board's decision and ordered to re-determine penalty consistent with the findings of the superior court on writ petition for administrative mandamus.

(Exhibit 2; *Please see allegations ¶ 82- ¶86*)

(111).On or about February 29, 2008, the Pennsylvania Medical Board based upon initial showing dismissed the Referral Proceeding against Plaintiff based on California Medical Board action and renewed active current, unrestricted medical license in Commonwealth of Pennsylvania which Plaintiff had held unrestricted since 1974. The medical license has been renewed twice since (**Exhibit 12**)

(112) On May 20, 2008, Plaintiff filed Motion to Dismiss Referral Proceeding in New York on the grounds that *,pursuant to New York State Education Law § 6530(9)(b), conduct which resulted in discipline in California would fall short of grounds if had occurred in New York, since charge of 'wrong diagnosis' in California made no medical sense* and provided evidence that his <u>conduct</u> in diagnosing ' thrombo-embolism' based on uncontroverted evidence and  as admitted by California Medical Board's experts that was correct or it would not be a wrong diagnosis in the State of  New York.

(113).That one alleged wrong diagnosis 8 years before in June 2000 was too remote in time to justify discipline. That he practiced for more than seven years in California after the 'incident' in June 2000 without any complaints and he never paid a dime in malpractice judgments or settlements ever in 47 years of practice in the medical profession and no actions were pending.[true as of this date] <u>That Plaintiff was not collaterally estopped from litigating false charges unsupported by facts or evidence and denial of due process in California.</u> (**Exhibit 13**)

(114) The Defendant took no action on this motion to dismiss.

(115)  On June 4, 2008, Plaintiff served Notice to terminate oral agreement not to practice in New York. That he will litigate in court any adverse Decision of California Medical Board upon remand.(**Exhibit 14**)

(116) On June 4, 2008 Defendant prepared and served Amended Statement of Charges based on 2006 California Medical Board's Decision which had been set aside and vacated by superior court on August 10,2007  and set the matter for hearing on July 16, 2008. Defendant would apply offensive collateral estopple to "CMB" findings but not to superior court's findings on writ petition (**Exhibit 15**)

(117) On June 13, 2008 the California Medical Board in contempt of superior court's order and judgment recycled *word by word, paragraph by paragraph ,page by page* the same vacated 2006 Decision and made findings of ' gross' and repeated negligence' for making of one wrong diagnosis and again revoked. (Exhibit 3)

(118) ) On or about June 16,2008 Claudia Hutton, Director Public Affair Group, State of New York Department of Health issued Press Release that out of State disciplined physicians can challenge that the out of State disciplinary findings were not supported by evidence. (Exhibit 25)

(119) On June 18, 2008 a teleconference was held with ALJ John Wiley. He continued the hearing to September 17, 2008. Mr. Bogan threatened unless a Consent Agreement or a Surrender Order prior to September 17, 2008,  the matter will proceed to hearing on September 17, 2008 at the time and place set forth.(**Exhibit 16**)

(120) On July 2, 2008 ALJ John Wiley issued its Ruling that despite denial of due process, unfairness and inaccurate findings in California, under New York State Public Health Law Section230(10)(p) Plaintiff will be prohibited from introducing such evidence. Plaintiff had submitted entire administrative record of hearing in California, the ALJ ruled that he would not allow introduction of such evidence. He noted that Plaintiff requested continuance till the court actions in California were completed. He ruled based upon Mr. Bogan's demand that Plaintiff sign agreement not to practice in New York and Plaintiff stated that he would not sign such an agreement. ALJ ruled that without such an agreement not to practice there will not be a continuance. (**Exhibit 17**)

(121) On July 30, 2008, Plaintiff wrote to Mr. Bogan, citing New York case law [***Willer v New York Board of Regents*** (3 Dept.1987) 126 A.D. 2d 802,510 N.Y.S.2d 730...... we

concluded that <u>petitioner may have been stymied in his effort to carry his burden of</u> <u>showing the lack of a full and fair opportunity to litigate in the prior proceeding</u> before the WCB and, therefore, we held that "petitioner should be permitted the opportunity to place on the record those items which he believes demonstrate his lack of a full and fair opportunity to litigate in the prior proceeding". Accordingly, we annulled the determination and remitted the matter to respondents for further proceedings] submitted entire administrative and judicial record of the hearing before California Medical Board that <u>he was denied due process and full and fair opportunity</u> to litigate issues in the proceeding before California Medical Board, therefore, Offensive Collateral Estopple did not apply. (**Exhibit 18**)

(122) On August 5, 2008 Mr. Bogan objected to introduction of such evidence

 (**Exhibit 19**)

(123) On August 9, 2008, Plaintiff made a motion to late Richard Daines, Commissioner State New York Department of Health to stay hearing set for September 17, 2008 and convene an Investigative Committee to determine if the findings by California Medical Board were supported by evidence under Health Law Section 230,(iii) which is also the official public [position of Department of Health. (**Exhibit 20**)

(124) On August 19, 2008, Defendant wrote to John Wiley ALJ that in order to protect the citizens of the state of New York, [protecting from a physician who restored pulses in the foot after each of the three surgeries, for false, unproven allegations of making one 'wrong diagnosis' eight (8) years ago] Plaintiff must enter agreement not to practice in NY. (**Exhibit 21**)

(125). On August 21, 2008, John Wiley ALJ <u>ruled that Plaintiff must sign agreement not</u> <u>to practice otherwise the hearing will remain scheduled for September 17, 2008</u>.

(**Exhibit 22**)

(126) On August 21, 2008, Defendant wrote to Plaintiff to sign agreement otherwise hearing will proceed on September 17, 2008.[even though the matter was still pending in California superior court] (**Exhibit 23**)

(127) On August 22, 2008 Plaintiff wrote to John Wiley, ALJ that during telephonic conversation on August 19, 2008 Mr. Bogan never advanced basis for entering the agreement not to practice in New York. That Mr. Bogan was saying then that Plaintiff was threat to citizens of New York State which lacks merit. That in prior telephone conference, he was informed that Plaintiff has unrestricted active current medical license in Pennsylvania that based on that he was entitled to New York territorial medical license since patients from New York can cross over to Pennsylvania to receive treatment. Thereupon, ALJ ruled that it was O.K. to for N.Y. residents to receive treatment from Plaintiff and medical license was not required. That he could seek employment in Veterans Administration Hospital in N.Y. based on Pennsylvania licensure and provide treatment to N.Y. residents which flies on the face of argument that Plaintiff was threat to New York residents. That New York has no jurisdiction on Federal institutions. That continuing hearing would cause multiplicity of proceedings and hardships. That California matter upon which New York action was based is still pending in the court. That there were no compelling reasons to proceed at that time. That Mr. Bogan's reasons not to practice lack merit and the hearing should be continued till the courts in California decide the matter. The ALJ never responded. (**Exhibit-24**)

(128) On August 22, 2008 Plaintiff wrote to Claudia Hutton, Director Public Affair Group, State Department of Health that on June 16, 2008 in a press release she informed that in an out of State Referral Disciplinary Proceeding, the out of State disciplined physician could challenge that the out of State disciplinary findings were not supported by evidence, that most of physicians elect not to do so and requested the basis or source of such a reporting. That Plaintiff tried to call her on several times but her secretary would not let him talk to her. Claudia Hutton never responded to the letter. (**Exhibit 25**)

(129). On September 2, 2008 , Defendant filed Notice of Charges based on December 6, 2006 Decision of the California Medical Board which had been set aside and vacated by California Superior Court on August 10,2007. Defendant would not give collateral estoppel effect to 2007 superior court's findings, yet would apply offensive collateral estoppel to 2006California Medical Boards decision which had been set aside and vacated and was ordered to re-determine penalty consistent with superior court's findings on writ petition, an order which would have been equally applicable to Defendant, since according to Defendant's own admission that it could only determine penalty and not make findings. (**Exhibit 26**)

(130) On September12, 2008, after having not heard from ALJ, Plaintiff had no choice but to sign agreement not to practice in New York because of threat of Offensive Collateral Estoppel to litigate false, fraudulent charges and facing a certain, pre-planned revocation and initiating another time consuming and expensive appeal process that Plaintiff could not afford to fight two legal battles in pro-per on two coasts at the same time.(**Exhibit 27**)

(131) On April 24, 2010, Plaintiff informed Mr. Bogan that California Court of Appeal had set aside and vacated the 2008 Decision of the California Medical Board and remanded to re-determine penalty consistent with the superior court's decision which did not make any finding of *'gross' or 'repeated negligence', 'gross' and 'repeated incompetence'* and there is no penalty for single act of negligence of allegedly making one wrong diagnosis as admitted by California Medical Board in its decisions and as provided under California Business & Profession Code Section 2229. Since there was no action by California Medical Board  and remand may take six months to a year, there was no ground for New York State to hold any proceedings against him and to continue to enforce its 'agreement' not to practice in New York which was entered to get continuance of the hearing. That penalty of 2 year revocation by California had long been served as of January 2009 that New York State Department of Health had prosecuted matter and had actually excluded him from practice of medicine in N.Y for more than 4 years since

December 2006, that any action by N.Y. State was redundant and unnecessary where N.Y. has penalized more than California. Plaintiff requested to restore State medical license to active status and abandon all further proceedings. Mr. Bogan never responded to letter. (**Exhibit 28**)

(132) On September 27, 2010 California Medical Board and found that Plaintiff was safe to resume practice and restored Medical license as of 2006. (Exhibit 6, *Please see allegations* ¶ 98)

(133) Plaintiff has called several times the investigators and the Office of the Professional Medical Conduct to drop any proceedings and to cancel the 'agreement' not to practice medicine in New York, the attorney Peter D. Van Buren who prepared and amended charges against Plaintiff in 2006 and 2008, has declined to cancel the 'agreement not to practice' and has threatened to fully prosecute the penalty based on false and fraudulent charges against Plaintiff brought by "CMB"[ applying offensive collateral estoppel

(134) Therefore, Plaintiff petitions this court for the only viable and available remedy, injunctive relief.

## FIRST CLAIM

### (Preliminary Injunction)

(135) On applying for and receiving a license to practice the profession as a Physician and Surgeon from State of New York, Plaintiff acquired property interest in License No.**119873** protected by United States Constitution.

(136).Having acquired a property interest in License No.119873, Plaintiff as a citizen of the United States, is entitled to continue to conduct professional practice in conformity with this license free from  arbitrary and capricious intrusions or interference by officials  of the State of New York, including  the defendants and persons acting under their supervision or control.

(137).The California Medical Board ("CMB") brought false, fraudulent charge against plaintiff for making one 'misdiagnosis' of 'thrombo- embolism'. At the hearing "CMB" experts admitted Plaintiff mad the correct diagnosis. The "CMB" seeing its case fall apart started a campaign of delay, harassment and character assassination. It filed First Amended Accusation charging falsification of medical records and making 4 false statements related to such fabrication. There was no evidence supporting the charges and were dismissed by ALJ. "CMB" could not prove documentation charges as alleged in Accusation. At the end of the hearing, it filed Second Amended Accusation charging making of 7 false statements based on testimony of improperly called rebuttal witnesses.

(138) "CMB" <u>denied hearing on "SAA"</u> found against Plaintiff on six out of seven charges of making false statements, <u>declined to consider, appraise, weigh and rule on the 'Admissions' by its experts on the charge of 'misdiagnosis</u> and illegally based its finding of "gross' and "repeated negligence" and 'gross' and 'repeated incompetence' on allegedly making one wrong diagnosis in order to justify penalty ; <u>bootstrapped new documentation charges/ findings into Decision without an accusation, notice, trial or proof;</u> after failing to prove documentation charges alleged in the Accusation and revoked medical license.

(139) The superior court dismissed five out of six charges of making statements and found on one charge of making a false statement at the hearing which <u>Plaintiff made nowhere in the record.without holding a limited trial or remanding for a trial</u>- a trial which Plaintiff never had had. However, <u>the superior court did not make a finding of 'moral turpitude'</u> which is essential for imposing any penalty in California..

(140) The superior court like "CMB<u>" declined to consider, appraise, weigh, rule on 'admissions' by medical board's experts</u> favoring Plaintiff on the charge of making wrong diagnosis and instead found Plaintiff made 'misdiagnosis' <u>based on weight of the evidence.  However did not uphold any findings of "gross" or "repeated negligence"and 'gross' and 'repeated incompetence'</u> which is necessary for imposition of any penalty.

(141).The court did not dismiss some of bootstrapped documentation charges and <u>did not remand for trial on bootstrapped charges</u> inserted into Decision by "CMB" <u>without accusation, notice, hearing or proof.</u> The court set aside and vacated California medical board's decision and <u>remanded for re-determination of penalty consistent with the findings of the superior court</u>. Under California case law <u>no penalty can be imposed on bootstrapped charges.</u>

 (142)The medical board could not determine any penalty based on 2007 findings of the superior court and in contempt of court order recycled its 2006 decision *word by word, paragraph by paragraph, page by page* as 2008 decision and determined penalty consistent with its recycled 2006 decision instead of findings of the court as commanded on writ petition and revoked again.

(143) The court of appeal found that dismissed findings by the superior court changed the factual and legal basis of the decision of revocation and set aside and vacated revocation and ordered to re-determine penalty consistent with findings of the superior court on writ petition.

(144)The California medical board for the second time disobeyed court's Order and again recycled its vacated 2006, 2008 decisions *word by word, paragraph by paragraph, page by page* as 2010 decision, reinstated license but placed on probation.

(145)The Defendant New York State Department of Health brought charges based on vacated California Medical Board's vacated 2006, 2008 Decisions, refused to grant hearing on false, fraudulent charges in California on which there never was a trial, notice, accusation and refusal of medical board and superior court <u>to consider, appraise, weigh and rule on unopposed admissions on charge of misdiagnosis favoring Plaintiff</u>-a blatant denial of a *hearing* and due process as ruled by United States Supreme Court.

(146) The Defendant on one hand conveniently applies offensive collateral estoppel to California Medical Board's twice vacated 2006, 2008 decisions, yet it would not accord the same  collateral estoppel effect to California superior court and Court of Appeals decisions.

(147) The Defendant has already caused Plaintiff to <u>serve penalty shockingly incommensurate and out of proportion to false and fraudulent, unproven charges</u> in California, has continued to harass and enforce agreement not to practice medicine in New York and has kept out Plaintiff out of practice for 5 years, where initial penalty of 2 years revocation by California has long been served since January 6 2009  and has <u>continued to prosecute the false, fraudulent charges brought by California Medical Board</u> based on incident <u>eleven (11) years ago</u> in June 2000,where Plaintiff was denied a full and fair hearing to litigate false, fraudulent charges, denying any trial , notice, accusation and a fair hearing, then <u>applying  offensive collateral estoppel</u>. The Defendant has declined to grant full and fair hearing on charges on which there never was a full and fair opportunity to litigate to begin with.

(148).The Defendant extorted not to practice agreement <u>under threat of offensive Collateral Estoppel and determining penalty based on false, fraudulent charges by California Medical Board,</u> in order for Plaintiff to have continuance to prevent multiplicity of proceedings while the matter was still being litigated in California Courts. The court should grant injunction against Defendant enforcing not to practice agreement.

(149)Even after California superior court dismissed several findings, which would not justify any discipline by the Defendant, it continued to disregard such judicial findings and continued to prosecute vacated false, fraudulent charges by California Medical Board.

(150)  Plaintiff believes based upon public utterances by Claudia Hutton, Director Public Affairs, that out of State disciplined physicians can challenge the underling decision on merit if they claim that the out of State underlying findings were not supported by evidence,the Defendant is harassing and discriminatively applying offensive collateral estoppel to physicians based on their national origin, ethnicity and religion as the California Medical Board is doing to members of the minority groups.

(151) Defendant is discriminating Plaintiff's right to due process guaranteed under 5th and 14th Amendment of the Constitution and New York State case law , based on Plaintiff's national origin, ethnicity and religion.

(152) In light of these deprivations, the Plaintiff will continue to suffer irreparable injury to his profession, livelihood, career, reputation, standing in the community and personal life unless the Defendant is enjoined and restrained, the Defendant will suffer no prejudice as a result of the restraint or injunction.

 (153). In light of these deprivations that per se violate the Due Process Clause of the Constitution of the United States, which may result in the possible revocation and or discipline, the Plaintiff has absolutely no adequate remedy at law. There is no action by Plaintiff pending against this Defendant in New York State Court.

(154). In light of the above facts, only a preliminary injunction will affect the restraint of the defendant in satisfaction of due process requirements.

## SECOND CLAIM
### (Permanent Injunction)

Plaintiff re-alleges and incorporates by reference the paragraphs 1-154 of this complaint and alleges:

(155).The Defendant acting in bad faith and without proper investigation brought frivolous, false, irrational, incomprehensible charges of "gross" and "repeated negligence" and 'gross' and 'repeated incompetence' based on false, fraudulent unproven charge of making a wrong diagnosis.

(156) The Defendant has brought false charge of moral unfitness and practicing fraudulently based on a false, fraudulent charge of making a false statement during hearing—a statement which Plaintiff made nowhere, anywhere in California proceeding and never received any trial on the issue.

(157).The Defendant has brought absurd, false charges on documentation which were bootstrapped into California Decision' without an accusation, notice, trial or proof.

(158). The Defendant is an obstinate transgressor of due process and civil rights and discriminatively applies offensive collateral estoppel and has injured Plaintiff far beyond the

penalty imposed by California Medical Board on the same unproven false, fraudulent charges and continues to do so.

(159).If Plaintiff is disciplined on false, fraudulent charges, in derogation of due process and civil rights, Plaintiff will suffer extreme financial, emotional, and professional hardships and to his detriment.

(160). Defendant has shockingly penalized by excluding Plaintiff from practice in New York for five (5) years and continues to do so incommensurate with the unproven underlying offense where the original penalty of 2 years of revocation was completed on January 6, 2009.

(161).The Plaintiff prays, in light of Defendant's conduct, a permanent injunction be ordered by this Honorable Court enjoining the Defendant, and its agents, employees, and servants from Imposing any penalty or discipline whatsoever based upon unconstitutional hearings and findings in California <u>where Plaintiff did not have full and fair opportunity to litigate charges against him</u> that it will violate the Plaintiff's constitutional rights to due process under the fifth and the Fourteenth Amendment of US Constitution.

(162)The Plaintiff prays that the Court must strike New York Public Health Law Section 230(10)(p) for applying offensive collateral estoppel across the board irrespective of the facts and circumstances of the underlying out of state discipline and thus providing a weapon to the Defendant to harass, discriminate and exclude competent physicians from earning a livelihood in State of New York and elsewhere based on their national origin, ethnicity, religion.[ Defendant wanted Plaintiff to agree not to practice in any State, as a condition of continuance even though Plaintiff holds an active, unrestricted, current medical license in Pennsylvania since 1974. Defendant's attorney Robert Bogan threatened Plaintiff with arrest, if he worked in V.A. Hospital in New York, based on his Pennsylvania medical license. The Federal Government Hospitals require a medical license from any one State]

**PRAYER**

The Plaintiff petitions this Court to grant the following relief:

    A. Issue Order to Show Cause ordering and directing the named defendant to appear before this Court at a time and on a date certain, to show cause, if any there may be, why a Preliminary Injunction Pendente Lite ought not issue enjoining and restraining defendant its agents, servants and employees, and all persons and agencies acting in concert or participation with them during the pendency of this action from <u>enforcing not to practice agreement</u>; <u>holding any Referral Proceeding</u>; <u>determining any penalty against Plaintiff</u> ; **against** applying offensive collateral estoppel; from prosecuting charges predicated on false, fraudulent charges and findings made without notice; trial or proof in California and from seriously violating due process.

    B. The Court should issue injunction against Defendant in using Plaintiff's agreement not to practice medicine in State of New York.

    C. The Court should grant permanent Injunction against Defendant applying offensive collateral estoppel against any physician unless waived by the physician facing discipline in a Referral Proceeding.

    D. The Court should strike New York State Public Health Law Section 230(10)(p) on constitutional ground for its blanket application of offensive collateral estoppel irrespective of facts and circumstances surrounding the out of State disciplinary proceeding.

    E. Following a full hearing on the constitutional claims raised here, issue its permanent injunction permanently restraining and enjoining \defendants from enforcing agreement not to practice medicine in New York; from proceeding with any disciplinary Referral Proceedings; from imposing any penalty; from applying offensive Collateral Estoppel against the Plaintiff, from prosecuting charges based false, fraudulent charges in California and upon unconstitutional hearings and

findings in California, without notice, trial or evidence violating due process rights guaranteed under Fifth and Fourteenth Amendment.

F.  Declaring that the acts of Defendants complained of violated the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution 42 U.S.C. § 1983 and New York State Constitution.

G.  Grant all other relief that is just, fair, and equitable, including , but not limited to, award of attorney's fees  with interest incurred by Plaintiff in maintaining actions to this date to protect his constitutional rights ,as provided for in 42 U.S.C. § 1988.


Date: July 23, 2011

Jehan Zeb Mir, MD Plaintiff

Certified American Board of Surgery

Recertified American Board of Thoracic Surgery


VERIFICATION


I am the plaintiff in the above entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my knowledge, except as to those matters which are therein alleged on information or belief and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 23th Day of July, 2011, at Redondo Beach, California 90277


Jehan Zeb Mir

Plaintiff in Pro-per


COMPLAINT FOR INJUNCTION                                    Page 45